An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-193

Filed 1 July 2026

Cumberland County, No. 22CR050303-250

STATE OF NORTH CAROLINA,

v.

JAVEENO RESIMO

Appeal by defendant from judgement entered 11 July 2024 by Judge Regina M. Joe in Cumberland County Superior Court. Heard in the Court of Appeals 28 August 2025.

> *Attorney General Jeff Jackson, by Special Deputy Attorney General Francisco Benzoni, for the State.*

> *Marilyn G. Ozer for the defendant.*

FREEMAN, Judge.

Defendant appeals from judgment entered upon a jury verdict finding him guilty of first-degree murder. On appeal, defendant argues the trial court erred by instructing the jury on (1) two specific circumstances—grossly excessive force and brutal or vicious circumstances—from which the jury could infer premeditation and

deliberation, and (2) flight. Defendant further argues that both jury instructions violated his constitutional rights. After careful review, we conclude that defendant received a fair trial free from prejudicial error.

## I.    Factual and Procedural Background

Jessi Lindsley was killed on 11 November 2021. Lindsley's friend last saw Lindsley on 4 November 2021 and last heard from Lindsley via social media around one to two days later. The friend continued to message Lindsley, and on 7 December 2021—after becoming worried from the lack of response—the friend reported Lindsley missing to the Cumberland County Sheriff's Office.

On 16 December 2021, Sergeant Mincey and other officers of the Cumberland County Sheriff's Office arrived at defendant's home after being informed that defendant may have information about Lindsley. Sergeant Mincey observed that Lindsley's blue van was in front of defendant's home and there was a shotgun on the front passenger seat. While Sergeant Mincey knocked on defendant's front door, other officers stood in the yard around the home. But after knocking and announcing that she was with the Cumberland County Sheriff's Office with no response, Sergeant Mincey left.

Rebbeca Cashwell and her two children had been living with defendant at that time. Cashwell testified at trial that defendant had just re-entered the home when she heard Sergeant Mincey knock. Defendant instructed Cashwell and her children to hide upstairs and remain quiet. Although defendant followed Cashwell and her

children upstairs, he entered and exited the room multiple times. While Cashwell and her children were hiding upstairs and defendant was pacing, the officers continued to ask defendant to come to the door. Cashwell stated she sat in the room for "close to an hour at least." Defendant returned and "said that he was going to take his chances on going out of the window and going through the backyard." Soon after, Cashwell returned downstairs, did not see defendant, and opened the door to go outside.

Law enforcement walked the backyard with a canine to search for anyone who may have left the home and did not find defendant. The officers returned to the home, and Sergeant Mincey spoke with Cashwell again. Cashwell recounted to Sergeant Mincey that defendant told her Lindsley's body "was on the side of the road in a little bit of water."

That same day, Sergeant Mincey called Ray Whittington who indicated he might have information about Lindsley. The next day, Sergeant Mincey and detectives searched and found Lindsley deceased in a creek under a bridge near defendant's home.

On 11 January 2022, law enforcement interviewed Whittington for the first time. Whittington had known Lindsley since around 2016 and had previously lived with her. Defendant had also lived with Whittington in 2017. At trial, Whittington testified that, on 12 November 2021, defendant and Michael Witt—defendant's friend and former roommate—came to his house when defendant first told Whittington, "he

got one" and "shot somebody." Whittington did not believe defendant, so defendant showed him a picture of "a greenish tarp with a body lying there with half of its head missing." Defendant laughed the whole time he showed Whittington the picture, and defendant told Whittington he had "got" Lindsley. Whittington testified at trial the picture looked like Lindsley, "but it didn't at the time" because he was "shocked."

When Whittington asked defendant what he did with the body, defendant laughed, "seemed kind of happy," and replied, "She's swimming with the fishes." Defendant told Whittington that Lindsley was "snitching" to law enforcement. Whittington testified at 1:30 a.m. that night, he sent Lindsley a Facebook message asking her to "[g]et up with [him] or something."

On 27 January 2022, law enforcement interviewed Cashwell again. Cashwell testified that she told law enforcement that defendant first told her he murdered Lindsley about a week and half before the officers came to defendant's house. Cashwell and defendant got into a physical argument, and defendant "put his hands around [Cashwell's] throat four different times trying to stop [her] from leaving," with both her baby and older child attached to her body.

Cashwell's older child mentioned Lindsley's items in defendant's garage, to which defendant responded, Lindsley "won't need those where she's at." Cashwell asked defendant if he had something to do with Lindsley's disappearance, and defendant asked her what she meant. When Cashwell asked defendant again, "You killed her, didn't you?" defendant laughed, and replied, "Yeah." Cashwell took

defendant's response to be a joke.

After Lindsley was reported missing, Cashwell "kind of started to believe [defendant] when he said that he had killed her." Cashwell again asked defendant if he had something to do with Lindsley's death. Defendant told Cashwell he had killed Lindsley in a variety of ways, and when Cashwell did not believe defendant, defendant told Cashwell he had a picture. Defendant showed Cashwell the picture, which Cashwell described was of Lindsley "laying there, and she looked like she was asleep, but you could see chunks of her brain."

At trial, Witt testified he was living with defendant on 11 November 2021 and was at defendant's home with defendant when Lindsley was killed.[1] Witt testified, on the night of 11 November 2021, he overheard defendant and Lindsley arguing and then heard two gunshots. Witt testified there was only "a small period of time" between the shots. Witt walked to where defendant and Lindsley were arguing and saw Lindsley laying at an angle on her back partially, in "a crunched-up position" with defendant standing over her. Defendant instructed Witt to retrieve a tarp from the back of his van, and Witt and defendant wrapped Lindsley's body in that tarp and placed her body in the back of the van. Subsequently, defendant drove that van to a

---

[1] Throughout the course of investigation related to Lindsley's murder, Witt's narrative of events varied between interviews with law enforcement. For example, during Witt's first interview with law enforcement, he denied living with defendant and being at the home on 11 November 2021. Witt later told law enforcement he was present in the home on 11 November 2021, but was upstairs. Eventually, Witt told law enforcement he was downstairs when he overheard arguing and gunshots outside. Some variations of Witt's testimony described a couple being present in the home before and after Lindsley's death.

bridge over a body of water five to six miles from defendant's home. They pulled over, and at defendant's instruction, Witt and defendant took Lindsley's body out of the van and threw her body over the bridge and into the water. There were no visitors at defendant's home that night, and neither defendant nor Witt left that night. Later the next day and after defendant had fallen asleep, Witt left defendant's house and went to his godmother's home.

At trial, defendant testified to his version of events. Defendant stated that on 11 November 2021, he left his phone at home with Witt to run errands, and Lindsley came to his house that evening. Defendant overheard Witt and Lindsley arguing when he entered his home, and when he questioned them about what was going on, Witt and Lindsley provided different answers. Lindsley then reached for a gun and pointed it at Witt, and defendant quickly took the gun from Lindsley. Witt then hit Lindsley, causing her to fall, and Witt continued to hit Lindsley while standing over her. Defendant testified he thought he heard a cracking sound while Lindsley lay on the floor unconscious and attributed this noise to be the potential cause of Lindsley's death. Witt then took Lindsley outside, and defendant heard two gunshots and the sound of a car leaving. Witt threatened defendant to not tell anyone what he had seen, and the two did not leave the home the next day.

Defendant was ultimately indicted on 15 April 2024 for first-degree murder and robbery with a dangerous weapon—the robbery charge was later dismissed. Defendant's matter went to trial on 25 June 2024.

The medical examiner testified that Lindsley died from shotgun wounds to her torso and head. Lindsley was likely first shot in the torso from "approximately two to three feet," which "completely sever[ed] her spinal cord . . . caus[ing] immediate paralysis from the waist down." Lindsley was likely then shot in the head "within ten feet."

The forensic analyst testified that DNA extracted from the trigger of the shotgun was "approximately 297 thousand times more likely if it originated from [defendant] and an unknown individual than if it originated from two unknown individuals." Similarly, DNA extracted from the shotgun grip was "approximately 6.13 octillion times more likely if it originated from [defendant] and an unknown individual than if it originated from two unknown individuals."

The data extraction detective testified that a two-second video created the night of 11 November 2021 was recovered from defendant's phone, and due to the video's short duration, it would likely be perceived as a photo. Whittington testified that video was the same image defendant had shown him—an image of "a greenish tarp with a body lying there with half of its head missing."

Relevant on appeal, the trial court instructed the jury on the premeditation and deliberation element of first-degree murder:

> Neither premeditation nor deliberation are usually susceptible of direct proof. They may be proved by circumstances from which they may be inferred such as the conduct of the defendant before, during, and after the killing, use of grossly excessive force, infliction of lethal

wounds after the victim is felled, brutal or vicious
circumstances of the killing, manner in which or the means
by which the killing was done

The trial court also instructed the jury on flight, stating: "Evidence of flight may be considered by you together with all other facts and circumstances in this case in determining whether the combined circumstances amount to an admission or show a consciousness of guilt. However, proof of this circumstance is not sufficient in itself to establish defendant's guilt." Defendant objected to these instructions and renewed his objections.

On 11 July 2024, the jury found defendant guilty of first-degree murder. The trial court sentenced defendant to life in prison without the possibility of parole. Defendant gave notice of appeal in open court.

## II. Jurisdiction

Because this Court has jurisdiction to hear an appeal from a final judgment of a superior court, we have jurisdiction over defendant's appeal of right. N.C.G.S. §§ 7A-27(b), 15A-1444(a) (2025).

## III. Standard of Review

We review a trial court's decision regarding jury instructions de novo. *State v. Osorio*, 196 N.C. App. 458, 466 (2009). "Jury instructions must be supported by evidence." *State v. Bagley*, 183 N.C. App. 514, 524 (2007) (citation omitted). When reviewing the evidence supporting a jury instruction, "[t]he evidence must be considered by the court in the light most favorable to the State, and the State is

entitled to every reasonable inference to be drawn from the evidence." *State v. Grullon*, 240 N.C. App. 55, 58 (2015).

## IV.    Discussion

On appeal, defendant argues that the trial court erred by instructing the jury on (1) two specific circumstances from which the jury could infer premeditation and deliberation and (2) flight. Specifically, defendant argues that both instructions are unsupported by "trial evidence." Defendant further argues that both jury instructions violated his constitutional rights. We address each argument in turn.

As a preliminary matter, "harmless-error review requires a defendant show that there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises, unless the error relates to a constitutional right." *State v. Leaks*, 379 N.C. 57, 62 (2021); *see also* N.C.G.S. § 15A-1443(a) (2025). "When a defendant argues the alleged error relates to a constitutional right, the burden shifts to the State to demonstrate, beyond a reasonable doubt, that the error was harmless." N.C.G.S. § 15A-1443(b) (2025).

Defendant alleges for the first time on appeal that both jury instructions violated his "constitutional rights to due process and a fair trial." However, "[c]onstitutional issues not raised and passed upon at trial will not be considered for the first time on appeal." *State v. Lloyd*, 354 N.C. 76, 86–87 (2001). Accordingly, the burden of showing prejudice is on the defendant. *Leaks*, 379 N.C. at 62.

## A. Grossly Excessive Force and Brutal or Vicious Circumstances

Defendant argues that the trial court erred by instructing the jury on two specific circumstances from which the jury could infer premeditation and deliberation. Specifically, defendant argues grossly excessive force and brutal or vicious circumstances are unsupported by the record where the State failed to present evidence of these circumstances.

Here, the trial court instructed the jury:

> Neither premeditation nor deliberation are usually susceptible of direct proof. They may be proved by circumstances from which they may be inferred such as the conduct of the defendant before, during, and after the killing, use of grossly excessive force, infliction of lethal wounds after the victim is felled, brutal or vicious circumstances of the killing, manner in which or the means by which the killing was done.

First, this Court and our Supreme Court have rejected the argument that a trial court errs by giving this instruction "even in the absence of evidence to support each of the circumstances listed." *State v. Leach*, 340 N.C. 236, 242 (1995); *see State v. Cummings*, 326 N.C. 298, 315 (1990); *State v. Baldwin*, 240 N.C. App. 413, 421 (2015). In *Leach*, the Supreme Court explained that the North Carolina Pattern Jury Instructions, which the trial court used to instruct the jury here, provide the jury with examples of circumstances, "which, if shown to exist, permit premeditation and deliberation to be inferred." *Leach*, 340 N.C. at 241; *see* N.C.P.I.–Crim. 206.13. The instruction explicitly "tells jurors that they 'may' find premeditation and deliberation

from certain circumstances, 'such as' the circumstances listed." *Leach*, 340 N.C. at 241. Accordingly, "[t]he instruction does not preclude a jury from finding premeditation and deliberation from direct evidence or other circumstances; more importantly, it does not indicate to the jury that the trial court is of the opinion that evidence exists which would support each or any of the circumstances listed." *Id.* The Supreme Court held: "the trial court did not err by giving the instruction at issue here, even in the absence of evidence to support each of the circumstances listed." *Id.* at 242.

Second, there is a plethora of evidence from which the jury could have found premeditation and deliberation. *See Leaks*, 379 N.C. at 61 (It is a defendant's burden to "show that there is a reasonable possibility that, had the error in question not been committed a different result would have been reached at the trial."). The evidence, viewed the light most favorable to the State, tended to show that defendant: shot Lindsley twice, less than ten feet away, with a shotgun to the back and head; shot Lindsley once while she was still alive, but was paralyzed; was seen standing over Lindsley's body in his home after Witt heard arguing and then gunshots; asked Witt to assist him with disposing of Lindsley's body; confessed to the murder of Lindsley to multiple witnesses; described the location of Lindsley's body to one witness; took a picture of Lindsley's body; and showed witnesses that picture. *Cf. State v. Smith*, 328 N.C. 99, 138 (1991) (holding that because there was evidence the victim was shot twice at short range, the "evidence support[ed] the court's instruction that

premeditation and deliberation can be inferred from a brutal and vicious killing or the use of grossly excessive force under the circumstances").

Third and finally, even assuming the instructions given by the trial court were not supported by evidence, defendant has failed to argue "a reasonable possibility that a different result would have occurred at trial if the alleged error had not occurred." *Leaks*, 379 N.C. at 63. Defendant's assertion that "one or more of the jurors could have found premeditation and deliberation based on [defendant's] allegations against Witt" is ungrounded because the trial court repeatedly instructed the jury to consider defendant's acts alone. *See State v. Brown*, 327 N.C. 1, 23 (1990) ("The jury charge when viewed as a whole is replete with instructions directing the jury's consideration to defendant's acts alone."). Our review of the record reveals that trial court instructed the jury that

> For you to find the defendant guilty of first-degree murder, the State must prove five things beyond a reasonable doubt. First, that the defendant intentionally and with malice killed the victim with a deadly weapon. . . . Second, the State must prove that the defendant's act was a proximate cause of the victim's death. . . . Third, that the defendant intended to kill the victim. . . . Fourth, that the defendant acted with premeditation. . . . And fifth, that the defendant acted with deliberation.

Accordingly, the trial court did not err in instructing the jury on grossly excessive force and brutal or vicious circumstances when considering whether the jury could infer premeditation and deliberation.

**B. Flight**

- 12 -

Defendant similarly argues the trial court erred by instructing the jury on flight because "[t]he State's evidence failed to show that [defendant] took steps to avoid apprehension."

Here, the trial court instructed the jury following the North Carolina Pattern Jury Instructions and stated: "Evidence of flight may be considered by you together with all other facts and circumstances in this case in determining whether the combined circumstances amount to an admission or show a consciousness of guilt. However, proof of this circumstance is not sufficient in itself to establish defendant's guilt." *See also* N.C.P.I.–Crim. 104.35.

"[A] trial court may properly instruct on flight where there is *some* evidence in the record reasonably supporting the theory that defendant fled after the commission of the crime charged." *State v. Lloyd*, 354 N.C. 76, 119 (2001) (emphasis added). We have defined flight as "leaving the scene of the crime and taking steps to avoid apprehension." *State v. Gibson*, 276 N.C. App. 230, 240 (2021). Therefore, "[m]ere evidence that [the] defendant left the scene of the crime is not enough to support an instruction on flight. There must also be some evidence that defendant took steps to avoid apprehension." *State v. Thompson*, 328 N.C. 477, 490 (1991).

Here, there is some evidence from which the jury could have found flight. The evidence, viewed the light most favorable to the State, tended to show that defendant: shot and killed Lindsley at his residence; hid when police came to his residence and requested to speak with him after Lindsley was reported missing; hid from law

enforcement in his home for around an hour; told Cashwell he was going to leave his house through a window and go "through the backyard" to evade law enforcement; and disappeared after his conversation with Cashwell until he was found and arrested two days later. Therefore, there was evidence to show that defendant took steps to avoid apprehension to support the flight instruction.

Even if it was error to instruct the jury on flight, defendant has failed to argue "a reasonable possibility that a different result would have occurred at trial if the alleged error had not occurred." *Leaks*, 379 N.C. at 63. At trial, the State presented overwhelming evidence of defendant's guilt including that: defendant's DNA was found on the murder weapon; testimony that defendant confessed to murdering Lindsley and showed witnesses a picture of her body after he shot her; a photo of Lindsley's body found on defendant's phone; and testimony from defendant that contradicted Lindsley's injuries. *See State v. McCanless*, 234 N.C. App. 260, 263 (2014) (explaining the State's presentation of "overwhelming evidence of defendant's guilt" defeated the defendant's argument that a reasonable possibility exists that a different result would have been reached had the error not occurred). Accordingly, there is not a reasonable possibility that the jury would have reached a different outcome absent the flight instruction.

## V. Conclusion

The trial court did not err instructing the jury on grossly excessive force and brutal or vicious circumstances when considering whether the jury could infer

premeditation and deliberation or flight.

NO ERROR.

Judge COLLINS concurs.

Judge ARROWOOD concurs in result only.

Report per Rule 30(e).